# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Northern PCS Services, LLC,

                              Plaintiff,

                                        Civ. No. 05-2744 (RHK/RLE)
                                        **MEMORANDUM OPINION AND**
                                        **ORDER**

v.

Sprint Nextel Corporation, *et al.*,

                              Defendants.

John L. Krenn, Craig A. Brandt, Dean C. Eyler, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, Minnesota, for Plaintiff.

Daniel J. King, Emily J. Culpepper, Amy Yervanian, King & Spalding LLP, Atlanta, Georgia, Jack M. Fribley, Krisann C. Kleibacker Lee, Faegre & Benson, LLP, Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

The 2005 merger of two large telecommunications companies – Nextel

Communications, Inc. ("Nextel") and Sprint Corporation – created a telecommunications

giant known as Sprint Nextel Corporation ("Sprint Nextel"). Prior to the merger, Sprint

Corporation and several of its related entities[1] had contracted with independently owned

and operated third parties, known as "Affiliates," to construct certain portions of Sprint's

nationwide wireless network. In return, the Affiliates received promises from Sprint that it

---

[1] Specifically, Sprint Spectrum L.P., WirelessCo, L.P., and Sprint Communications Company, L.P., each of which has been named as a Defendant in this action. For ease of reference, the Court refers to these entities collectively with the former Sprint Corporation as "Sprint."

would not compete with the Affiliates in designated geographical areas.  Several of those

Affiliates – including the Plaintiff here, Northern PCS Services, LLC ("Northern") – have

now sued, alleging that as a result of the merger Sprint is competing with the Affiliates in

violation of their agreements.  Currently pending before the Court is Defendants' Motion

for Summary Judgment.  For the reasons set forth below, the Court will grant the Motion in

part and deny it in part.

## BACKGROUND

Although there has been a substantial amount of briefing in connection with the

instant Motion, the basic facts do not appear to be in dispute; rather, it is the legal

significance of those facts that the parties hotly contest.  Accordingly, the factual

background set forth below is taken largely from the parties' briefs and omits citations to

the record.[2]

In 1994, several Sprint-related entities and several cable-television companies

formed a joint venture called "Sprint PCS."  The purpose of the Sprint PCS venture was to

acquire licenses from the Federal Communications Commission ("FCC") to operate a

nationwide wireless telecommunications network within a specified range of frequencies (a

"spectrum").  Because of the high cost of building its planned network, Sprint decided that

it would divide the network into several geographic "Service Areas" – Sprint would finance,

_____

[2] Many of the facts also are taken from <u>Horizon Personal Communications, Inc. v. Sprint Corp.</u>, No. Civ. A. 1518-N, 2006 WL 2337592 (Del. Ch. Aug. 4, 2006), a lawsuit brought by another Affiliate asserting claims similar to those in the instant action.

2

construct, and maintain the network in Service Areas located in urban markets, while in

rural markets Sprint would contract with Affiliates to handle those tasks.  In return, the

Affiliates would be granted the right to use Sprint's spectrum licenses in their Service

Areas and the right to use the Sprint brand and related marks and logos in connection with

their wireless services.

On October 19, 1999, Northern entered into a Management Agreement (the

"Management Agreement") with Sprint to become an Affiliate; Northern's Service Area

covers parts of Minnesota, North Dakota, Iowa, and Wisconsin.[3]  Section 2.3 of the

Management Agreement, which is at the heart of this case, provides as follows:

> **Exclusivity of Service Area:** [Northern] will be the only person or entity that
> is a manager or operator for Sprint PCS with respect to the Service Area and
> neither Sprint PCS nor any of its Related Parties will own, operate, build or
> manage another Wireless Mobility Communications Network in the Service
> Area so long as this agreement remains in full force and effect . . . .

Northern expended approximately $90 million building, operating, managing, and

maintaining the Sprint PCS network in its Service Area, including selling Sprint-branded

wireless products and promoting the Sprint brand.

At approximately the same time that Sprint PCS developed its nationwide wireless

network, Nextel developed its own nationwide network.  The Nextel network operates on a

different spectrum from Sprint PCS (700-900 Megahertz versus 1900 Megahertz) and uses

---

[3] Sprint drafted the Management Agreement with standard terms that it proposed to all
potential Affiliates, including Northern.  However, Sprint negotiated the final terms of each Affiliate's
Management Agreement separately.  Hence, the Management Agreements between Sprint and its
Affiliates contain many (but not completely) identical terms.

3

different technology (integrated Digital Enhanced Network ("iDEN") versus Code Division

Multiple Access ("CDMA")).  Despite the technological differences, Nextel's wireless

products sound the same as Sprint PCS's products and provide essentially the same

customer experiences.

On December 15, 2004, Sprint and Nextel announced that they intended to merge.

That same day, Sprint held a conference call with its Affiliates to discuss their role post-

merger.  Sprint recognized that, as a result of the merger, its Affiliate contracts would need

to be modified; it apparently intended to renegotiate the contracts before the merger

closed.  Discussions broke down, however, and "reaffiliation" never occurred.

On July 13, 2005, the shareholders of Sprint and Nextel approved the merger.

Before the merger closed, however, seven Affiliates sued Sprint and Nextel, as well as

several related entities.  Although Northern did not sue at that time, it commenced the

instant action a short time later.[4]  In their lawsuits, the Affiliates alleged, among other

things, that the merger would violate their exclusivity rights because Sprint Nextel would be

selling competing wireless products – namely, wireless products utilizing Nextel's 700-

900 Megahertz network – under the Sprint brand in the Affiliates' Service Areas.  They also

alleged violations of confidentiality covenants in their Management Agreements and

breaches of trademark-license agreements entered into concomitantly with the

---

[4] In order to avoid preliminary injunction proceedings that would have delayed the merger, Sprint entered into forbearance agreements with the Affiliates; these agreements imposed certain conditions on Sprint Nextel's operations while the Affiliates' lawsuits remained pending.

Management Agreements.[5]  At least two Affiliates, including Northern, also asserted claims for tortious interference with their Management Agreements by Nextel and a civil conspiracy between Sprint and Nextel to breach their Management Agreements.

In the ensuing months, a number of the Affiliates' lawsuits settled, but two proceeded to trial in 2006.  In the first, styled Horizon Personal Communications, Inc. v. Sprint Corp., No. Civ. A. 1518-N, 2006 WL 2337592 (Del. Ch. Aug. 4, 2006), the Delaware Chancery Court held a ten-day bench trial, after which the parties submitted extensive post-trial briefing.  Although the plaintiffs in that case had initially argued that Sprint Nextel's sale of wireless products utilizing Nextel's network in their Service Areas was precluded by their Management Agreements, they ultimately abandoned that claim post-trial.  The plaintiffs continued to assert, however, that Sprint Nextel's use of the Sprint brand while selling such competing products was improper.

In a lengthy and comprehensive opinion, the Horizon court concluded that Sprint Nextel's use of the Sprint brand to sell competing products in the plaintiffs' Service Areas did not violate the express terms of either their Management Agreements or their Trademark Agreements.  Id. at *12.  Nevertheless, the court ruled that doing so would violate the implied covenant of good faith and fair dealing.  Id. at *13.  Accordingly, the court issued a permanent injunction enjoining Sprint Nextel from utilizing the Sprint brand

---

[5] Like the Management Agreement, each trademark-license agreement was drafted by Sprint and contained standard terms that were proposed to each Affiliate.  Northern's trademark-license agreement is referred to herein as the "Trademark Agreement."

when selling competing products or services in the plaintiffs' Service Areas.[6]  With respect

to the plaintiffs' other claims, the court held that (1) the alleged breaches of the

confidentiality covenants in the plaintiffs' Management Agreements either were not ripe or

had not been proven, id. at *20-22, and (2) the plaintiffs had failed to prove their tort

claims, id. at *25.

In the other Affiliate lawsuit tried in 2006, an Illinois Circuit Court concluded that

Sprint Nextel's "ownership, management, and operation of the Nextel network in plaintiff's

Service Area constitutes a breach of the Management Agreement." iPCS Wireless, Inc. v.

Sprint Corp., No. 05 CH 11792 (Ill. Cir. Ct. Aug. 14, 2006) (Def. Ex. 14).[7]  Rather than

granting injunctive relief, which the court felt was "unmanageable" because it required the

court to "continuously supervise the operations of a multi-billion dollar company," the

Illinois court ordered Sprint Nextel to divest itself of Nextel in the plaintiff's Service Area.

(Id.)  That order has been stayed while it is appealed by Sprint

Nextel.

In the instant case, Northern asserts claims similar to those in Horizon and iPCS.  In

particular, Northern alleges that (1) Sprint Nextel has breached (and will continue to

breach) the exclusivity and confidentiality clauses in the Management Agreement (Counts I

---

[6] Pursuant to a Stipulation between the parties here, Defendants have agreed to abide by the terms of the Horizon court's injunction in Northern's Service Area.  (See Def. Ex. 16.)

[7] It does not appear that the iPCS plaintiff asserted claims other than for breach of contract and declaratory judgment, although the precise nature of its claims is not clear.

and II);[8] (2) Sprint Nextel's use of the Sprint brand when selling competing products

violates the Trademark Agreement (Count III); (3) Nextel tortiously interfered with

Northern's rights under the Management Agreement (Count V); and (4) Sprint and Nextel

conspired to deprive Northern of its rights under the Management Agreement (Count VI).[9]

Defendants now seek summary judgment on all of Northern's claims.

### STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the

nonmoving party, there is no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477

U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material

facts in the case are undisputed.  Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't

of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the

evidence, and the inferences that may be reasonably drawn from it, in the light most

favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721,

723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir.

1997).  The nonmoving party may not rest on mere allegations or denials, but must show

through the presentation of admissible evidence that specific facts exist creating a genuine

---

[8] In Count I, Northern alleges anticipatory breaches of the Management Agreement, while in Count II Northern alleges actual breaches of that Agreement.  The Court analyzes Counts I and II together, because the factual predicate underlying those claims is the same.

[9] Northern also seeks a declaratory judgment that Sprint Nextel's actions violate the Management Agreement (Count IV), but this claim necessarily rises or falls with Counts I and II.

issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

### I.     Breach of the Management Agreement (Counts I and II)

The crux of Northern's Second Amended Complaint is Counts I and II, which concern Sprint Nextel's alleged breach of the Management Agreement.  In particular, Northern alleges that Sprint Nextel has breached (and will continue to breach) the Management Agreement in three ways:  first, by owning and operating a competing wireless network – the Nextel iDEN 700-900 Megahertz network – in Northern's Service Area; second, by using the Sprint brand and related trademarks and logos to sell Nextel products and services in Northern's Service Area; and third, by disclosing Northern's confidential information to Nextel.  (See Sec. Am. Compl. ¶¶ 81, 90-91; Mem. in Opp'n at 20-29, 32-33, 36-38, 41-43.)[10]  Sprint Nextel argues that it has not violated, and will not violate, the

_____

[10] Northern has also alleged several other breaches of the Management Agreement, but none appears to remain at issue in this case.  In particular, Northern has alleged that Sprint Nextel breached the Agreement by selling wireless products in Northern's Service Area that were not designated as "Sprint PCS" products (Sec. Am. Compl. ¶ 94) and by adopting plans and policies favoring Nextel at the expense of Northern (id. ¶ 95).  Defendants have argued that they are entitled to summary judgment on these claims, and Northern failed to address those arguments in its Memorandum in Opposition.  Accordingly, the Court deems the claims abandoned.

Northern also has asserted that Sprint Nextel plans to "migrate" the Nextel network onto a portion of the 1900 Megahertz spectrum – the"G-Block" – in violation of the exclusivity provision in the Management Agreement.  The "migration" apparently resulted from interference that portions of the Nextel network were causing with public-safety systems using the 800 Megahertz spectrum.  (See Def. Mem. at 28-29.)  To correct the problem, the FCC ordered Nextel to stop using certain portions of the 800 Megahertz spectrum; in return, the FCC granted Nextel licenses to operate in the G-Block.  (Id. at 28.)  At oral argument, however, Sprint Nextel averred that it has no plans to use the G-Block in its

Management Agreement in any way.  For the reasons set forth below, Sprint Nextel is only

partially correct.

> **A.   Northern has proffered sufficient evidence
> to create a triable issue as to whether Sprint Nextel's
> ownership and operation of the Nextel network in Northern's
> <u>Service Area would violate Section 2.3 of the Management Agreement.</u>**

Northern's principal contention is that Sprint Nextel has violated (and will continue

to violate) the exclusivity provision in Section 2.3 of the Management Agreement by

owning and operating the Nextel network in Northern's Service Area.  As noted above,

Section 2.3 states:

> **Exclusivity of Service Area:** [Northern] will be the only person or entity that
> is a manager or operator for Sprint PCS with respect to the Service Area and
> neither Sprint PCS nor any of its Related Parties will own, operate, build or
> manage another Wireless Mobility Communications Network in the Service
> Area so long as this agreement remains in full force and effect . . . .

By carefully parsing this language into its two key clauses, Sprint Nextel argues that

Section 2.3 clearly affords it the right to own and operate the Nextel network in Northern's

Service Area.  It contends that the first clause in Section 2.3 – "[Northern] will be the only

person or entity that is a manager or operator for Sprint PCS with respect to the Service

Area" – means that Northern has exclusive rights *only in the 1900 Megahertz spectrum*,

because "Sprint PCS" is defined in the Management Agreement as a group of entities

holding licenses in that spectrum.  (Def. Mem. at 18-22.)  It next contends that the second

---

Affiliates' Service Areas.  (<u>See also</u> Def. Ex. 21 at 3335-36.)  Accordingly, any claims concerning the
G-Block are not ripe.  <u>See</u> <u>Horizon</u>, 2006 WL 2337592, at *1 n.1 (recognizing that G-Block claims
were unripe for adjudication).

clause of Section 2.3 – "neither Sprint PCS nor any of its Related Parties will own, operate, build or manage another Wireless Mobility Communications Network in the Service Area" – also must be limited to the 1900 Megahertz spectrum, because the Management Agreement defines "Wireless Mobility Communications Network" as "a radio communications system operating in the 1900 Megahertz spectrum range." (Id. at 17-18.)

Thus, according to Sprint Nextel, the two clauses in Section 2.3 complement one another: the first clause gives Northern the exclusive right, in its Service Area, to operate on behalf of the entities comprising Sprint PCS in the 1900 Megahertz spectrum, while the second clause assures Northern that Sprint PCS and its related entities will not acquire or build any other 1900 Megahertz wireless network in the Service Area. Read in that fashion, Sprint Nextel's ownership and operation of the Nextel network, which does not utilize the 1900 Megahertz spectrum, does not violate the Management Agreement.

In response, Northern argues that the parties intended the term "Sprint PCS" in Section 2.3 to mean "Sprint's wireless business." In other words, Northern argues that the purpose behind Section 2.3 was to grant it the exclusive right to sell *all* wireless products and services on Sprint's behalf in its Service Area, *regardless* of the frequency at which those products or services operate. (See Mem. in Opp'n at 24 ("[T]he contract language indicating that Northern would be the only manager or operator in its Territory 'for Sprint PCS' means that Northern is the only entity that may rightfully hold itself out as representing the Sprint wireless business in that territory.").) In support of its argument, Northern points to a plethora of parol evidence regarding the intent behind Section 2.3.

10

(See id. at 20-29, 32-33.)  Before the Court may consider such evidence, however, it must

conclude that the term "Sprint PCS" in Section 2.3 is ambiguous; in the absence of any such

ambiguity, "parol evidence . . . tending to vary the terms of the contract . . . is inadmissible."

Decatur County Feed Yard, Inc. v. Fahey, 974 P.2d 569, 574 (Kan. 1999).[11]

Under Kansas law, whether a contract is ambiguous is a question of law for the

Court, to be answered based on the ordinary and plain meaning of the terms used therein.

See Liggatt v. Employers Mut. Cas. Co., 46 P.3d 1120, 1123 (Kan. 2002); Jones v. Reliable

Sec. Incorporation, Inc., 28 P.3d 1051, 1059 (Kan. Ct. App. 2001).  The Court's ultimate

goal is to divine the intent of the parties; when a contract is unambiguous, the parties' intent

is manifest from the terms of the contract itself.  Liggatt, 46 P.3d at 1125.  If the terms of

a contract are ambiguous, however, the Court may consider parol evidence to ascertain the

parties' intent.  Yet, the Court must not use parol evidence to *create* an ambiguity in a

contract – only after it has reviewed the contract in its entirety, giving it a "fair, reasonable,

and practical construction," and concluded that an ambiguity exists within the contract's

four corners may the Court resort to parol evidence to determine the parties' intent.  Id.

---

[11] As a federal court sitting in diversity, this Court must apply Minnesota law, including
Minnesota's choice-of-law rules, to Northern's claims.  E.g., Schwan's Sales Enters., Inc. v. SIG
Pack, Inc., 476 F.3d 594, 595-96 (8th Cir. 2007).  The contracts at issue here contain choice-of-law
clauses mandating the application of Kansas law to disputes arising thereunder.  Generally speaking,
Minnesota courts recognize and apply choice-of-law clauses in contracts requiring the application of a
foreign state's law.  See id. at 596 (citing Milliken & Co. v. Eagle Packaging Co., 295 N.W.2d 377,
380 n.1 (Minn. 1980)).  For this reason, and because all parties appear to concede that Kansas law
governs Northern's breach-of-contract claims, the Court will apply Kansas law to those claims.

Having carefully considered the language in Section 2.3, as well as the language found elsewhere in the Management Agreement, and having given that language a "fair, reasonable, and practical construction," the Court agrees with Northern that the term "Sprint PCS" in Section 2.3 is ambiguous.  It reaches that conclusion for several reasons.

First, limiting the term "Sprint PCS" in Section 2.3 to the 1900 Megahertz spectrum would render superfluous some of the language contained in that section, a result eschewed under Kansas law.  E.g., LDF Food Group, Inc. v. Liberty Mut. Ins. Co., 146 P.3d 1088, 1095 (Kan. Ct. App. 2006) ("[J]udicial interpretation should not render any [contract] term meaningless."); see also Restatement (Second) of Contracts § 203(a) (1981) ("In the interpretation of a[n] agreement or a term thereof . . ., an interpretation which gives a[n] effective meaning to all the terms is preferred to an interpretation which leaves a part . . . of no effect.").  If, as Sprint Nextel argues, the term "Sprint PCS" in the first clause of Section 2.3 is limited to the 1900 Megahertz spectrum, then it would be redundant for the second clause of Section 2.3 to restrict Sprint PCS's rights to compete in that spectrum.  Stated differently, Sprint Nextel asserts that the first clause of Section 2.3 assigned Sprint PCS's rights in the 1900 Megahertz spectrum (and only that spectrum) to Northern.  Yet, if that were the case, it would be unnecessary for the second clause of Section 2.3 to state (again) that Sprint PCS could not own, operate, build or manage a 1900 Megahertz network in Northern's Service Area – those would be rights that Northern had already acquired via the

first clause of Section 2.3.  Sprint Nextel's proposed interpretation, therefore, would render the term "Sprint PCS" in the second clause of Section 2.3 meaningless.[12]

Second, the language in the Management Agreement outside of Section 2.3 suggests that the term "Sprint PCS" was not intended to be limited to the 1900 Megahertz spectrum. For example, the Agreement defines "Sprint PCS Products and Services" as wireless communications services and associated products "designated by Sprint PCS . . . as the products and services of the Sprint PCS Network," which is "the national wireless network [of] Sprint PCS."  (Def. Ex. 7 at 11.)  The meaning of the term "Sprint PCS Products and Services," however, expressly excludes "wireline [*i.e.*, non-wireless] products or services." (Id. at 12.)  There would be no need to carve out wireline services from the definition of "Sprint PCS Products and Services" if the term "Sprint PCS" meant only 1900 Megahertz wireless products and services.

Third, the iPCS court denied Defendants' summary-judgment motion because, in its view, Section 2.3 of the plaintiff's Management Agreement was ambiguous as to the scope and extent of the rights granted to the plaintiff by Sprint PCS.  (See Pl. Ex. 155.)  Of course, as Sprint Nextel correctly points out, the Horizon court (in dicta) reached the

---

[12] The Court acknowledges that interpreting the Management Agreement as Northern suggests also would render certain of the language in Section 2.3 meaningless.  In particular, Northern argues that the first clause of Section 2.3 granted it all of "Sprint's wireless business" in Northern's Service Area.  Were that true, there would be no need for the second clause of Section 2.3 to limit Sprint PCS's ability to own or operate a competing wireless network.  The fact that either side's interpretation of Section 2.3 would leave at least some language therein without meaning merely highlights the ambiguity in the Agreement.

opposite conclusion.  (See Def. Mem. at 15.)  But the conflict between iPCS and Horizon

serves to further undermine Sprint Nextel's argument, because that conflict highlights that

reasonable minds can differ over the meaning of Section 2.3.  See Coleman Co. v. Int'l

Union, United Auto., Aircraft & Agric. Implement Workers, 317 P.2d 831, 841 (Kan.

1957) (agreement is ambiguous where "[r]easonable minds could differ" as to meaning of

terms); see also Liggatt, 46 P.3d at 1125 (ambiguity exists where "the face of the [contract]

leaves it genuinely uncertain which one of two or more meanings is the proper meaning").[13]

        For all these reasons, the Court concludes that the phrase "Sprint PCS" in Section

2.3 of the Management Agreement is ambiguous.  That conclusion, however, does not end

the Court's inquiry.  In order to survive summary judgment, Northern must proffer

sufficient parol evidence to create a triable issue as to whether the term "Sprint PCS" in

Section 2.3 actually was intended to mean "Sprint's wireless business."  In other words, it is

not sufficient for the Court to conclude that the Management Agreement is ambiguous;

rather, the Court must also find that the evidence proffered by Northern, when viewed in the

─────────────────────

        [13] It would seem that the iPCS decision collaterally estops Sprint Nextel from arguing that the
Management Agreement is unambiguous.  Indeed, the issue was resolved against Sprint Nextel in that
case, and it clearly had a full and fair opportunity to litigate the issue there.  See Kessinger v. Grefco,
Inc., 672 N.E.2d 1149, 1156 (Ill. 1996) (collateral estoppel applies where (1) issue decided in prior
lawsuit is identical to issue in subsequent lawsuit, (2) prior lawsuit was resolved by judgment on merits,
and (3) party against whom estoppel is asserted was party to prior lawsuit); see also Fischer v.
Scarborough (In re Scarborough), 171 F.3d 638, 641 (8th Cir. 1999) (collateral estoppel effect of
state-court judgment in federal court determined under state law).  Horizon does not alter that
conclusion, because that court considered the ambiguity issue only in dicta, and Northern was not a
party to that proceeding.  Because Northern has not argued that Sprint Nextel is collaterally estopped
from challenging ambiguity, however, the Court need not address the issue.

light most favorable to it, supports Northern's interpretation of the Agreement.  In the Court's view, there is ample evidence in the record to support Northern's interpretation of the Management Agreement.

While it is unnecessary for the Court to identify all of the parol evidence that supports its conclusion, it will nevertheless point out several key pieces of evidence it believes indicate that Section 2.3 was intended to have a broader scope than Sprint Nextel suggests.  For instance, several high-level Sprint employees have testified that the term "Sprint PCS" was intended to mean "Sprint's wireless business."  (See, e.g., Pl. Ex. 102 at 2917 (William Blessing, one of the "prime initiators" of the Sprint Affiliate program: "Sprint PCS referred to the wireless mobile telephone business of Sprint Corporation"); Pl. Ex. 101 at 19 (David Bottoms, a leader of Sprint's Affiliate program:  "we presumed that [Affiliates] would be Sprint's physical presence in [their] territory"); id. at 31 (noting that it was "the intention that those affiliates would be the only parties selling wireless services on Sprint's behalf in those territories"); id. at 37 ("the objective of the affiliate program was that they [i.e., Affiliates] were Sprint in those markets"); id. at 41 (admitting that Affiliates "had the exclusive right to be the wireless operator for Sprint" in their Service Areas).)[14]

_____

[14] Northern's principals had the same understanding.  (See Pl. Ex. 113 at 31 (John Rose, Northern board member: "My understanding was that . . . [Northern] would have exclusive rights to Sprint wireless services and [Northern] would be the sole provider of that service in [its] designated area."); Def. Ex. 36 at 64 (Cheryl Scapanski, Northern board member:  "[W]hen we entered into this agreement, we were under the understanding that it was totally exclusive.  In other words, that Sprint could not compete against us in the cellular operations in any of the territories that we entered into in the [Management Agreement].”); Def. Ex. 31 at 20-21 (William Casto, Northern's CEO:  "[Northern] would be Sprint in the markets that [it] served, and . . . would have the exclusive rights to sell wireless

Several Sprint documents also support this broader reading of the Management Agreement.  One such document indicates that "Sprint PCS is restricted from competing with the Affiliate," and that "Sprint PCS has not 'held out' spectrum to compete; Affiliate has access to *all* available spectrum."  (Pl. Ex. 100 at 10 (emphasis added).)  A similar document states that each Affiliate "has the *exclusive* right and the obligation to offer Sprint Wireless Products and Services in a defined service area."  (Pl. Ex. 108 at SPRp-085-00000206 (emphasis added).)  And, a press release Sprint issued in 2002 stated that "only Sprint should be used in the headline of a press release, [not] Sprint PCS" and that "Sprint PCS should be referenced as 'Sprint's wireless division' or 'Sprint's PCS division,'" because "Sprint PCS is not a separate company from Sprint."  (Pl. Ex. 120.)

In addition, several Sprint employees apparently believed that Sprint Nextel's ownership and operation of the Nextel network in Affiliates' Service Areas would violate the Affiliates' Management Agreements.  For example, Bottoms stated in April 2005 that "the exclusivity provisions . . . are likely to be violated Day 1-ish," *i.e.*, the first day post-merger.  (Pl. Ex. 131; see also Pl. Ex. 100 at 61-62 (testimony by CEO of Sprint Affiliate Ubiquitel that Steve Nielsen, Sprint's chief integration officer for the Nextel merger, admitted that the merger would result in breach of Affiliates' Management Agreements).)  Other evidence also suggests that Sprint Nextel does not enjoy the right to compete in the Affiliates' Service Areas.  (See Pl. Ex. 126 (Sprint employee Clint Slusher: "The

---

service in those markets").)

Management Agreement prohibits Sprint from operating within the Affiliate's Service Area (licensed area).").)

Finally, in addition to all of this parol evidence, the Court also believes that a reasonable fact-finder could infer from Northern's substantial investment in the Sprint PCS network that the parties did not intend to permit Sprint to compete with Northern in its Service Area. In the Court's view, an inference can fairly be drawn that Northern would not have agreed to expend $90 million building and maintaining the Sprint PCS network in its Service Area unless it was assured Sprint would not later compete with Northern, using the Sprint brand, in that area.[15]

For all of these reasons, the Court concludes that the term "Sprint PCS" in Section 2.3 of the Management Agreement is ambiguous and that Northern has proffered sufficient evidence to create a triable issue as to whether that term was intended to mean "Sprint's wireless business." Accordingly, summary judgment will be denied on this claim.

**B.      Sprint Nextel's use of the Sprint brand to compete
in Northern's Service Area would violate the implied covenant
of good faith and fair dealing inherent in the Management Agreement.**

-------------------------------------------------

[15] Northern's expert has opined that it would have been unreasonable for Northern to make this investment without such a guarantee, but the Court has not relied on the expert's opinion. Expert testimony need only be considered when it would "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. The Court does not believe that the proposed expert testimony would assist a fact-finder in either understanding the evidence or determining whether Northern would have made its investment without assurance that Sprint would not compete in its Service Area.

Northern next argues that Sprint Nextel has breached (and will continue to breach) the Management Agreement by using the Sprint brand and its related marks and logos (collectively, the "Sprint Brands") to sell competing products in its Service Area. Northern contends that its right to be "the sole 'manager or operator' must encompass exclusive representation of the brands, or the 'exclusivity' would be rendered meaningless. An essential element of being the 'only manager or operator' for Sprint's wireless business was and is the ability to benefit from the Sprint brands . . . ." (Mem. in Opp'n at 26.) The Court agrees.

As an initial matter, the Court rejects Sprint Nextel's suggestion that this claim is moot because it has agreed not to use the Sprint Brands to compete with Northern. It is true that Sprint Nextel has stipulated that it will abide by the Horizon court's injunction – which enjoined Sprint Nextel from using the Sprint Brands in connection with the sale of Nextel products and services – in Northern's Service Area. (See supra n.6.) According to Sprint Nextel, that stipulation means that there exists no "live dispute" with respect to its use of the Sprint Brands in Northern's Service Area. (Hear. Tr. at 41.) Yet, Sprint Nextel conceded at oral argument that Northern has raised issues in this case beyond the penumbra of the Horizon court's injunction, such as Sprint Nextel's use of the Sprint logo on Nextel customers' invoices. (Id.) Accordingly, the brand issue remains ripe for adjudication, notwithstanding the parties' Stipulation.[16]

---

[16] Northern's entitlement to relief also is unaffected by its Forbearance Agreement with Sprint Nextel, pursuant to which Sprint Nextel agreed not to use the Sprint Brands in connection with the sale

As to the substance of Northern's claim, Sprint Nextel argues that Northern's brand rights are controlled not by Section 2.3 of the Management Agreement, but rather by the Trademark Agreement, which merely granted Northern a non-exclusive license to use the Sprint Brands.  According to Sprint Nextel, because it has granted Northern only non-exclusive rights, it cannot be precluded from using the Sprint Brands in connection with Nextel products and services in Northern's Service Area.  (Def. Mem. at 24-25.)

Sprint Nextel is correct that, on its face, Section 2.3 of the Management Agreement (when read in conjunction with the Trademark Agreement) "appears to allow Sprint Nextel to use the Sprint brand in [Northern's] Service Area[] to sell non-Sprint PCS Products and Services." Horizon, 2006 WL 2337592, at *12.  The Horizon court, however, concluded that allowing Sprint Nextel to do so would violate the implied covenant of good faith and fair dealing and would deny the plaintiffs "the benefit of their bargain." Id. at *13.[17] Because the Court fully agrees with the Horizon court's conclusion, it will not engage in an "affectation of research and a pretense of authorship and originality," Davis v. United States, No. 01-CV-337, 2001 WL 984869, at *1 (E.D.N.Y. July 19, 2001), and will instead quote extensively from the Horizon opinion:

> Plaintiffs argue that allowing Sprint Nextel in their Service Areas to re-brand the Nextel stores and sell iDEN products using the "very brand that Plaintiffs have

_____

of Nextel products or services.  As Sprint Nextel admitted at oral argument, that Agreement expired on January 1, 2006.  (Hear. Tr. at 83; see also Def. Ex. 10 § 4.1.)

[17] Under Kansas law, every contract contains an implied covenant of good faith and fair dealing, which precludes a party from acting so as to "destroy[] or injur[e] the right of the other party to receive the fruits of the contract." Daniels v. Army Nat'l Bank, 822 P.2d 39, 43 (Kan. 1991).

spent millions of dollars promoting would impair Plaintiffs' rights under the Management Agreements [as the exclusive manager or operator for Sprint PCS] and their substantial investment in their goodwill and customer loyalty." Defendants respond that absent any grant of exclusive use of the Sprint brand in their Service Areas, Plaintiffs can expect no more than they secured themselves in the Agreements, *i.e.,* a non-exclusive license to use the Sprint brand to market Sprint PCS Products and Services.

The granting clause of the [T]rademark [A]greement . . . gives Plaintiffs the right to use the Sprint brand and marks only in connection with the "marketing, promotion, advertisement, distribution, lease or sale of Sprint PCS Products and Services . . . in the Service Area." In section 4.1 of the . . . Trademark Agreement, Plaintiffs acknowledge Sprint Nextel's "exclusive right, title and interest in and to" the Sprint brand. The plain language of the . . . Trademark Agreement thus appears to allow Sprint Nextel to use the Sprint brand in Plaintiffs' Service Areas to sell non-Sprint PCS Products and Services. Sprint Nextel owns the Sprint brand, while Plaintiffs merely have the right to use it to market Sprint PCS Products and Services in their Service Areas. Neither the Management Agreement nor the [Trademark] Agreement, however, addresses the scenario presented by the merger of Sprint and Nextel, namely, Sprint Nextel's desire to sell a product distinct from, but directly competitive with[,] that sold by Plaintiffs using the same brand as Plaintiffs from stores that look the same and bear the same brand name as Plaintiffs. In fact, several witnesses representing parties on both sides of the Agreements testified that the parties did not anticipate such a situation when they negotiated the Agreements.

The questions for the Court are thus what rights do Plaintiffs have as, essentially, non-exclusive licensees of the Sprint brand and what would the parties have agreed to had they anticipated the current scenario. Assuming the parties would have agreed to prevent Sprint Nextel from doing what it now wishes to do, the Court also must determine whether compelling fairness requires quasi-reformation of the Agreements to prohibit that conduct pursuant to the implied duty of good faith and fair dealing.

The "'purpose of trademark law is . . . to guarantee that every item sold under a trademark is the genuine trademarked product, and not a substitute.'" "A trademark is meant to identify goods so that a customer will not be confused as to their source." In fact, "[t]he only function of a trademark is to designate a product or service." Fundamentally, then, a trademark is an indication of source.

The term "non-exclusive" "has repeatedly been defined as meaning that the licensee is granted a bare right to use the trademark or patent being licensed without any right to exclude others . . . from utilizing the mark or invention involved." Plaintiffs therefore have a non-exclusive right to use the Sprint brand to identify their products as Sprint PCS Products and Services operating on the

nationwide Sprint Nextel CDMA network.   Absent Plaintiffs' exclusivity rights, Sprint Nextel, as the owner of the Sprint brand and the CDMA network, also could use the brand to sell Sprint PCS Products and Services in the Service Areas.   Everyone agrees, however, that the Agreements prohibit that, subject to a few explicit exceptions not relevant here.   Similarly, the evidence shows that Plaintiffs considered that prohibition essential to their business plan.

Sprint Nextel proposes to do something it contends is outside the exclusivity-based prohibition.   It wishes to use the Sprint brand on iDEN products and services and to sell those products and services from stores marked with the Sprint logo.   In other words, Sprint Nextel wishes to use the same brand as Plaintiffs to identify a different product than Plaintiffs and to sell those different products from a store that looks just like Plaintiffs' stores in Plaintiffs' Service Areas.   In the Court's opinion, allowing Sprint Nextel to do so would deny Plaintiffs the benefit of their bargain.

*          *          *

The open issue is whether Sprint Nextel, having effectively given Plaintiffs exclusive rights to use the Sprint brand and marks for Sprint PCS Products and Services in their Service Areas, subject to a few specific exceptions, has the unfettered right to use the Sprint brand and marks on its 700-900 MHz spectrum or iDEN products and services in Plaintiffs' Service Areas. The Agreements do not address this issue.   Still, the Court finds based on the language of the Agreements and other relevant evidence that had Sprint Nextel's predecessors and Plaintiffs thought to negotiate over the current scenario, they would have agreed to proscribe Sprint Nextel from taking the branding actions it now claims the right to take.

Plaintiffs reasonably could have expected when they entered into the Agreements that their contracting partner would not claim the right to act in derogation of fundamental principles of trademark law and contrary to Plaintiffs' interests under their trademark licenses.   But, arguably, that is exactly what Sprint Nextel will do if it markets iDEN products and services in Plaintiffs' Service Areas using the same Sprint brand as Plaintiffs use to market CDMA products and services from stores that look the same as Plaintiffs' stores. Instead of identifying the source of only Sprint PCS Products and Services, the Sprint brand will identify the source of both Sprint PCS Products and Services and Sprint Nextel iDEN products and services.   Although that may not be problematic outside Plaintiffs' Service Areas, the Agreements created a different situation within those areas by granting Plaintiffs exclusivity as to Sprint PCS Products and Services.   Sprint Nextel cannot offer Sprint PCS Products and Services in its legacy Nextel stores however it brands them.

21

Similarly, Plaintiffs have no right to offer iDEN products and services in their stores.  Thus, in terms of iDEN products and services, Sprint Nextel and Plaintiffs are unrelated entities.  In the Court's opinion, allowing Sprint Nextel to use the Sprint brand and new logo for iDEN products and services and on legacy Nextel stores in these circumstances will cause confusion in Plaintiffs' marketplace and may have a negative effect on Plaintiffs' business.  As stated in Dunkin' Donuts, Inc. v. Northern Queens Bakery, Inc., "There is a great likelihood of confusion when the infringer uses the exact trademark as the plaintiff. In such cases, likelihood of confusion is inevitable. In fact, cases where a defendant uses an identical mark on competitive goods hardly ever find their way into the appellate reports.  Such cases are open and shut."

2006 WL 2337592, at *12-14 (internal quotation marks and citations omitted).  The Horizon opinion completely and thoroughly addresses this issue and, in the Court's opinion, its analysis is equally apt here.  Indeed, Sprint Nextel has "acknowledged and accepted" that opinion and has not taken an appeal therefrom.  (Hear. Tr. at 18.) Accordingly, the Court adopts this portion of the Horizon opinion and, as a result, it will deny summary judgment on this claim.[18]

### C. Northern has failed to prove a breach based on Sprint Nextel's use or disclosure of Northern's confidential information.

Northern's final alleged breach of the Management Agreement concerns the disclosure of its confidential information to Sprint Nextel employees.  Under Section 12.2 of the Agreement, the parties "must keep confidential" all of their "Confidential

---

[18] Sprint Nextel argues that even if it is not permitted to use the Sprint Brands in Northern's Service Area, it cannot be prevented from using the Brands in its national advertising because the Management Agreement specifically reserves to Sprint Nextel discretion over such advertising, "including the character of the advertisements, use of brands, or the like."  (Def. Mem. at 26.)  As Northern correctly points out, however, Sprint Nextel's discretion to control its national ads "does not insulate its misuse of the [Sprint] [B]rand[s] in advertising in Northern's territory."  (Mem. in Opp'n at 31 (emphasis added).)

Information" and must "not disclose [it] to others," except for "purposes authorized in th[e] agreement." (Def. Ex. 1 at 43-44.)[19]   Northern argues that Section 12.2 prohibits the disclosure of its confidential information to any Sprint Nextel employees "involved in" the Nextel network and that access to the information must be limited to Sprint Nextel's "Affiliate Group." (Mem. in Opp'n at 41-42.)[20]   Based on its interpretation, Northern argues that Sprint Nextel has breached, and will continue to breach, its confidentiality obligations under Section 12.2.

Horizon rejected this same argument. There, the court first noted that if it were to literally interpret the Management Agreement, Sprint Nextel would be an "other" to whom confidential information could not be disclosed. 2006 WL 2337592, at *21. Yet, the court recognized that the parties to the Agreement "on the Sprint Nextel side have no employees and exist solely for purposes of holding spectrum licenses and being contractual parties." Id.[21]   In practice, therefore, confidential information had always been disclosed to Sprint (which is now Sprint Nextel), and literally interpreting the confidentiality provision of the Management Agreement would make performance impossible. To prevent reaching such a result, the court held that Section 12.2 must be read

---

[19] "Confidential Information" is defined as technical, marketing, financial, strategic, or any other information provided under the Management Agreement. (Def. Ex. 7 at 2.)

[20] The "Affiliate Group" is a group of Sprint Nextel employees responsible for certain functions related to Affiliates. See Horizon, 2006 WL 2337592, at *7.

[21] The Sprint-side parties to the Horizon plaintiffs' Management Agreements included Sprint Spectrum L.P., and WirelessCo, L.P., see 2006 WL 2337592, at *3 n.28, which are the two Sprint-side parties to the Management Agreement at issue here (see Def. Ex. 1).

to permit disclosure of the plaintiffs' confidential information to *all* Sprint Nextel

employees, not just those in the Affiliate Group, "subject to the contractual restriction on

use of that information." In other words, such disclosure was permissible for "purposes

authorized" in the Management Agreement, which did not include the right to use the

information to compete with the plaintiffs. Id.

The Court agrees with and adopts this ruling, which Northern does not even discuss

in its Memorandum in Opposition. Accordingly, the Court concludes that Northern's

confidential information may be disseminated to all of Sprint Nextel's employees, as long

as that information is disclosed only for "purposes authorized" in the Management

Agreement and is not used to compete with Northern.

Northern identifies a handful of instances in which its confidential information has

been disclosed to Sprint Nextel employees outside of the Affiliate Group and claims that

these amount to breaches of Section 12.2. (Mem. in Opp'n at 42.) These isolated

instances cannot support Northern's claim, however, because Northern nowhere argues that

the information was disclosed for unauthorized purposes under the Management Agreement

or that the information was used to compete with Northern.[22] Because Northern has not

_____

[22] Northern does identify one instance in which its confidential information was provided to a Nextel representative, who then used the information to contact a Northern customer about Nextel. (See Mem. in Opp'n at 42-43; Pl. Exs. 172, 175.) Northern has not indicated whether it lost that customer or was otherwise damaged as a result of such conduct, however. Although this clearly amounts to Sprint Nextel "competing" with Northern using Northern's confidential information, the Court believes that this one instance of improper competition constitutes an immaterial breach of the Management Agreement. See Almena State Bank v. Enfield, 954 P.2d 724, 727-28 (Kan. Ct. App. 1998). Moreover, Northern offers only a witness's speculation that such a problem could recur (Mem.

specifically identified any *unauthorized* disclosures of its confidential information,

Defendants are entitled to summary judgment on this claim.[23]

For all these reasons, Defendants are entitled to summary judgment on Northern's

breach-of-contract claims only insofar as those claims concern the disclosure of

Northern's confidential information.  To the extent the claims concern (1) Sprint Nextel's

ownership and operation of the Nextel network in Northern's Service Area and (2) Sprint

Nextel's use of the Sprint Brands to compete with Northern in its Service Area, summary

judgment will be denied.

## II.    Breach of the Trademark Agreement (Count III)

Northern next asserts that Sprint Nextel has breached the Trademark Agreement by

using the Sprint Brands to promote Nextel products in Northern's Service Area.  (See Sec.

Am. Compl. ¶¶ 59-60, 103.)  This claim, however, merely restates a portion of Northern's

claim for breach of the Management Agreement, as discussed above.  Indeed, when the

---

in Opp'n at 43 (noting that Sprint Nextel's Rule 30(b)(6) witness testified "I don't know" when asked if such a problem could recur with other customers)), which is insufficient to support an anticipatory breach claim.  See Equity Investors, Inc. v. Ammest Group, Inc., 563 P.2d 531, 537 (Kan. Ct. App. 1977) (anticipatory breach exists only where it is "clear" that party to contract will not perform).

[23] The Court notes that, despite not having an obligation to do so, Sprint Nextel has enacted measures above and beyond those required in the Management Agreement to restrict the dissemination of Northern's confidential information, and it has agreed to adhere to those measures for the duration of the Agreement.  (Def. Mem. at 32-33.)  These additional measures should ameliorate any concerns Northern may have about Sprint Nextel's use of its confidential information. To the extent practicable, however, Sprint Nextel should try not to disseminate such information to employees with responsibilities for both its CDMA and its iDEN business.  Otherwise, those employees will be placed in the difficult position of "attempt[ing] . . . to compartmentalize [Northern's] Confidential Information on the one side and their work on the iDEN business on the other."  Horizon, 2006 WL 2337592, at *22 n.183.

Court analyzed that claim (see supra at 18-23), it necessarily had to read the Management

Agreement and the Trademark Agreement together.  See also Horizon, 2006 WL 2337592,

at *12-14 (interpreting Management Agreement and Trademark Agreement together meant

that Sprint Nextel would violate implied covenant of good faith and fair dealing by selling

Nextel products and services in plaintiffs' Service Areas using Sprint Brands).  Moreover,

the relief Northern seeks – (1) a declaration that Sprint Nextel's use of the Sprint Brands

when selling competing products or services in Northern's Service Area is improper and

(2) an injunction enjoining the practice – would be the same whether the specific contract

breached is the Management Agreement or the Trademark Agreement.  Accordingly,

Northern's claim for breach of the Trademark Agreement, to the extent it is predicated on

Sprint Nextel's use of the Sprint Brands in connection with the sale of Nextel products or

services in Northern's Service Area, is duplicative and will be dismissed.  See Artis v.

Francis Howell N. Band Booster Ass'n, Inc., 161 F.3d 1178, 1182 (8th Cir. 1998)

(affirming dismissal of redundant claims under 42 U.S.C. § 1983); Guy Carpenter & Co. v.

John B. Collins & Assocs., Inc., Civ. No. 05-1623, 2006 WL 2502232, at *9 (D. Minn.

Aug. 29, 2006) (Tunheim, J.) (dismissing as duplicative unfair competition claim

predicated on same facts as other tort claims).

Northern also alleges that Sprint Nextel has breached a covenant in the Trademark

Agreement (found in Section 11.4 thereof) precluding it from "initiat[ing] any products or

promotions under names which are confusingly similar to any names of national product

offerings or promotions by [Northern]."  (Mem. in Opp'n at 33-35.)  Yet, Northern has

failed to proffer any evidence or offer any argument in its Memorandum in Opposition as

to *how* Sprint Nextel purportedly violated that provision.  A review of the Second Amended

Complaint suggests that Northern takes issue with Sprint Nextel's use of "Fair & Flexible"

plans to promote Nextel products in its Service Area.  (See Sec. Am. Compl. ¶ 59.)[24]  But

Sprint Nextel's use of "Fair & Flexible" plans to promote Nextel products in the Service

Area cannot violate Section 11.4 of the Trademark Agreement, because those are not

national products or offerings *by Northern*.  Indeed, as the Horizon court found, the phrase

"national product offerings or promotions" cannot mean *any* Sprint PCS products or

services, because Affiliates like Northern "do not offer these products or services

nationally."  2006 WL 2337592, at *10.[25]

     Accordingly, Defendants are entitled to summary judgment on Count III.

## III.   Declaratory Judgment (Count IV)

     In Count IV of the Second Amended Complaint, Northern seeks a declaratory

judgment that Sprint Nextel's actions violate (or will violate) the Management Agreement.

---

     [24] "Fair & Flexible" plans are Sprint PCS price plans that Northern offers to its customers.
(Def. Mem. at 35; Sec. Am. Compl. ¶ 59.)

     [25] Northern argues that interpreting the Trademark Agreement in this fashion makes no sense,
because neither Northern nor any other Affiliate "has ever offered a truly national product or promotion
on its own."  (Mem. in Opp'n at 34.)  For this reason, Northern argues that the phrase "national
product offerings or promotions" must mean "national *Sprint* products and promotions" – such as "Fair
& Flexible" plans – offered by Northern in its Service Area.  (Id. at 34-35 (emphasis added).)  The
Court disagrees, because had the parties so intended, they could have stated so explicitly in the
Trademark Agreement.  Moreover, there is no dispute that the Management Agreement reserved to
Northern the right to sell non-Sprint PCS products and services.  Thus, Northern *could* have made
"national product offerings and promotions," even though it has never done so.

The result in Count IV, therefore, merely parallels the result in Counts I and II.  Thus, the

Court will grant in part and deny in part Defendants' Motion with respect to Count IV, in

accordance with its rulings above on Counts I and II.

## IV.      Tortious Interference with Contract (Count V)

In Count V of its Second Amended Complaint, Northern alleges that Nextel

tortiously interfered with the Management Agreement.  (Sec. Am. Compl. ¶¶ 115-120.)  In

particular, Northern asserts that Nextel "played a central role" in the merger decision,

which caused Sprint Nextel to breach the Management Agreement.  (Mem. in Opp'n at 44.)

Nextel argues that it is entitled to summary judgment on this claim because Northern has

failed to proffer evidence indicating that (1) Nextel intentionally procured a breach of the

Management Agreement and (2) Northern has sustained quantifiable damages stemming

from Nextel's allegedly tortious conduct.  (Def. Mem. at 38-41.)  The Court disagrees.

The Court begins with Nextel's latter argument, on which it need not linger long.  It

is true that damages are an element of a tortious-interference claim under Minnesota law.

See, e.g., Kallok v. Medtronic, 573 N.W.2d 356, 362 (Minn. 1998).[26]  Yet, the Minnesota

Supreme Court has repeatedly recognized that litigation expenses incurred as a result of

---

[26] Unlike the breach-of-contract claims, where the Court relied on a choice-of-law provision in the parties' contracts, Northern's tort claims present a choice-of-law issue.  Northern is a Minnesota limited liability company, while Defendants are Kansas and Delaware entities with principal places of business in Kansas and Virginia.  Accordingly, the Court must decide whether to apply Minnesota, Delaware, Kansas, or Virginia law to the tort claims.  No party has raised a choice-of-law issue, however, and each has addressed these claims under Minnesota law; accordingly, Minnesota law applies.  See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum state applies by default where parties do not raise choice-of-law issue).

being "thrust" into litigation by a defendant's tortious conduct satisfy the "damages" element of such a claim.  See, e.g., id. at 363; Prior Lake State Bank v. Groth, 108 N.W.2d 619, 622 (Minn. 1961).  There can be little doubt here that Northern has incurred litigation expenses, including attorney fees, as a result of being "thrust" into litigation with Sprint Nextel.[27]

Nextel's other argument is equally unavailing.  It asserts that Northern's tortious-interference claim fails because Sprint Nextel has not breached the Management Agreement (Def. Mem. at 40), but, for the reasons stated above, whether Sprint Nextel has breached the Agreement remains an open question, to be resolved at trial.  (See supra at 9-23.)  In any event, it does not appear that Northern must prove an actual breach of the Management Agreement in order to establish its tortious-interference claim.  See A& L Labs., Inc. v. Bou-Matic, LLC, Civ. No. 02-4862, 2003 WL 21005305, at *3 (D. Minn. Apr. 25, 2003) (Magnuson, J.) (noting that "a tortious interference claim may lie when a rival attempts to secure the breach of a contract, not merely when such a breach actually happens") (citing Metro. Sports Facilities Comm'n v. Minn. Twins P'ship, 638 N.W.2d 214 (Minn. Ct. App. 2002)).[28]

---

[27] To the extent Nextel argues that this claim falters because Northern cannot quantify its damages, that argument also fails.  Even if Northern cannot quantify with precision the profits or business goodwill allegedly lost as a result of Nextel's conduct, clearly it can quantify its litigation expenses.

[28] Horizon held that the plaintiffs' tortious-interference claim failed because Sprint Nextel had not breached the Management Agreement.  2006 WL 2337592, at *25.  Unlike this case, however, the Horizon court was not called upon to address whether Sprint Nextel's ownership and operation of the Nextel network in the plaintiffs' Service Areas would violate their Management Agreements, since

Moreover, Northern has adduced sufficient evidence that Nextel knew that its merger with Sprint would result in a breach of the Management Agreement, but opted to press forward with the merger anyway. (See, e.g., Pl. Ex. 152 at 120 (Nextel's Director of Strategy, Atish Gude, recognizing prior to merger that Sprint Affiliate programs needed "adjustments" because "by virtue of the merger, some things were going to get violated"); Pl. Ex. 136 at 100-02 (Nextel's CFO, Paul Saleh, acknowledging pre-merger "risk" that obligations to Affiliates would be breached, but that Nextel was "prepared to take that risk"); Pl. Ex. 150 at 24 (Nextel's CEO, Tim Donahue:  "Was I aware that there – if there could be a breach of agreements on the affiliate side the answer to that was, yes.").) Accordingly, it reasonably can be inferred that Nextel acted with the intent to induce Sprint to breach the Management Agreement.  See Restatement (Second) of Torts § 766 cmts. h, j (1979) (noting that intent is necessary element of tortious-interference claim, but intent can be inferred when actor "knows that the interference is certain or substantially certain to occur as a result of [its] action"); Schumacher v. Ihrke, 469 N.W.2d 392, 332 (Minn. Ct. App. 1991) (same).

Summary judgment will therefore be denied as to Count V.

## V.    Civil Conspiracy (Count VI)

Northern's final claim alleges that Sprint and Nextel conspired to "disadvantage Northern . . . and to deprive Northern . . . of the exclusivity pledge contained in the

---

the plaintiffs there abandoned that claim.  The Horizon opinion is therefore inapposite vis-a-vis Northern's tortious-interference claim.

Management Agreement." (Sec. Am. Compl. ¶ 122.) Defendants argue that this claim must be dismissed because (1) there is no evidence of a "meeting of the minds" between Sprint and Nextel and (2) Northern has failed to show damages proximately caused by the purported conspiracy. (Def. Mem. at 41-42.)[29] The Court disagrees.

Defendants are correct that a civil conspiracy requires proof of a "meeting of the minds" among the alleged conspirators, the object of which is "to achieve the contemplated result." Bengston v. Dzandzara, No. A05-531, 2006 WL 538951, at *5 (Minn. Ct. App. Mar. 7, 2006) (citing Bukowski v. Juranek, 35 N.W.2d 427, 429 (Minn. 1948)). Here, the "contemplated result" of the alleged conspiracy was the breach of the exclusivity pledge in the Management Agreement. (Sec. Am. Compl. ¶ 122.) Accordingly, in order to survive summary judgment, Northern must proffer evidence tending to show that Sprint and Nextel agreed that Sprint would breach its exclusivity obligations.

Northern has satisfied its burden in this regard. Indeed, the evidence discussed above in connection with Northern's tortious-interference claim shows Nextel's awareness that the Management Agreement likely would be breached as a result of the merger. Similarly, Northern has pointed to evidence demonstrating Sprint's awareness that the Management Agreement likely would be breached by the merger. (See supra at 18.) In the

---

[29] Defendants also argue that because the tortious-interference claim fails, the civil-conspiracy claim necessarily fails as well, since "civil conspiracy is not an independent cause of action, but is based on the commission of an underlying tort." (Def. Mem. at 41 (quoting Smith v. United States, Civ. No. 02-4378, 2004 WL 1701036, at *4 (D. Minn. July 29, 2004)).) This argument is unpersuasive, because (as set forth above) the Court concludes that Northern's tortious-interference claim does not fail at the summary judgment stage.

Court's view, Sprint's and Nextel's knowledge that the merger might well breach the Management Agreement, followed by their decision to consummate the merger anyway, is sufficient to permit a reasonable fact-finder to conclude that the parties had a "meeting of the minds" to breach the Agreement.

As to Defendants' damages argument, they simply recast the argument rejected above in connection with Northern's tortious-interference claim. That argument fares no better here. See Paidar v. Hughes, 615 N.W.2d 276, 280-81 (Minn. 2000) (attorney fees are recoverable damages when such fees are incurred as a "natural and proximate consequence" of defendant's tortious conduct); Groth, 108 N.W.2d at 499-500 (same); Restatement of Torts § 914 (1939) (same).

Accordingly, summary judgment will be denied as to Count VI.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is **ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 80) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1. The Motion is **DENIED** as to Counts I and II of the Second Amended Complaint insofar as the claims alleged therein are based on (1) Sprint Nextel's ownership and operation of the Nextel network in Northern's Service Area and (2) Sprint Nextel's use of the Sprint Brands to sell or promote competing products or services in Northern's Service Area, and in all other respects is **GRANTED** as to Counts I and II;

32

2.      The Motion is **GRANTED** as to Count III of the Second Amended Complaint

and that claim is **DISMISSED WITH PREJUDICE;**

3.      The Motion is **DENIED** as to Count IV of the Second Amended Complaint

insofar as that claim seeks a declaration that (1) Sprint Nextel's ownership

and operation of the Nextel network in Northern's Service Area and (2)

Sprint Nextel's use of the Sprint Brands to sell or promote competing

products or services in Northern's Service Area violates (or would violate)

the Management Agreement, and in all other respects is **GRANTED** as to

Count IV; and

4.      The Motion is **DENIED** as to Counts V and VI of the Second Amended

Complaint.

Dated: March  27 , 2007                                    s/Richard H. Kyle
                                                           RICHARD H. KYLE
                                                           United States District Judge